Submitted on briefs July 14, reversed and remanded September 14, 1920.

## H. R. WYLLIE CHINA CO. *v.* VINTON.*

### (192 Pac. 400.)

**Trial—Legal Effect of Writing Ordinarily for Court.**

1. The legal effect of a writing is ordinarily to be determined by the court, and not by the jury.

**Sales—Time for Payment Under Written Contract of Sale Held for Jury.**

2. In an action for goods delivered under an agreement evidenced by writings, whether defendant was to make payment within 15 or 30 days *held* for the jury, in the light of the accompanying circumstances.

**Sales—Bilateral Executory Contracts may be Modified by Changing Time for Payment.**

3. Unfilled orders, which were bilateral executory contracts, could be modified by fixing a different time for payment, without further consideration, especially where seller was contending that buyer had defaulted in previous payments and buyer was insisting that plaintiff had been unreasonably slow in making shipments.

**Sales—Failure of Buyer to Pay Installment Does not Entitle Seller to Terminate Contract.**

4. The failure of a buyer to pay an installment does not alone and of itself enable the seller to terminate his contract, so as to avoid liability for failure to make subsequent deliveries called for by the contract; but, in addition to the bare fact of failure to pay, the conduct of the buyer must indicate an intention on his part to abandon the contract, or a design no longer to be bound by the terms agreed upon. Laws 1919, p. 120, § 76a, not applying.

**Sales—Payment for One Installment may be Made Condition Precedent to Future Deliveries.**

5. Parties to a contract of sale of goods may expressly stipulate that payment for one delivery shall be a condition precedent to other deliveries, and if a contract for continuing deliveries of wares contains such a stipulation, the failure of the buyer to pay a given installment enables the seller to rescind.

> [Rescission of contract for successive deliveries of goods on account of nonpayment of installment, see notes in 3 Ann. Cas. 901; 11 Ann. Cas. 1049; Ann. Cas. 1913D, 1021.]

From Multnomah: E. V. LITTLEFIELD, Judge.

Department 1.

In this action the H. R. Wyllie China Company, a corporation, sued to recover the price of wares sold

---

*For collection of cases construing Section 45, Uniform Sales Act (§ 8208, Oregon Laws 1920), see Williston on Sales, 803; Terry's Uniform State Laws, Ann., 223.        REPORTER.

to George M. Vinton, and, while Vinton admits that he has not paid for the wares sold to him, he counterclaims by alleging that the plaintiff had refused to deliver other wares agreed by it to be delivered, thereby damaging him in an amount greater than the unpaid price of the wares which had been delivered. There was a verdict allowing the claim of the plaintiff, and disallowing the counterclaim of Vinton. The defendant appealed.

The plaintiff maintains a plant in Huntington, West Virginia, where it manufactures porcelain and other wares. George M. Vinton is a jobber, and maintains a place of business in this state in Portland. While Vinton keeps some goods in stock at his place of business in Portland, most of the business transacted by him is done through traveling salesmen employed by him. These salesmen visit retail merchants throughout the different states and solicit orders for wares. Any order obtained by a salesman is sent to Vinton, and, if approved by him, the order is then sent to a manufacturer of the wares, with directions to the manufacturer to send the goods directly to the retailer. Vinton pays the manufacturer; and the retailer pays Vinton.

It may aid in arriving at a correct understanding of the controversy if the time covered by the evidence is divided into three periods: (1) The period ending with July 7, 1916; (2) the period beginning with July 7, and ending with September 26, 1916; and (3) the period after September 26th.

It appears that Vinton had been placing nearly all, if not all, his orders with the T. A. McNicol Pottery Company, of East Liverpool, Ohio. On May 2, 1916, however, Vinton wrote to the plaintiff, advising it that he had been placing his orders with the McNicol Company, and that, since he feared that the McNicol

Company would be unable promptly to fill his orders, he would be glad to receive from the plaintiff samples, catalogue, and prices, if the plaintiff was "in a position to take on, say, a carload of business per month." On May 18th the plaintiff answered, by advising Vinton that the company could furnish "one or two cars per month," and with this letter the plaintiff sent a copy of its catalogue together with a price schedule. In its letter of May 18th the plaintiff says to Vinton:

"We are in a position to handle some additional business, and could very readily furnish you one or two cars per month. We would be glad to commence hearing from you with business, which will have prompt attention."

In June the plaintiff received from Vinton and accepted an order for a carload of wares. There is no controversy about the order given and accepted in June, and the fact of the giving of this order is of interest only because it seems to have been the only business transacted between the parties prior to July 7, 1916. The litigation involves no orders except those given by Vinton and accepted by the plaintiff on or between July 7 and September 26, 1916. The correspondence by letters and by telegrams between the parties during the period ending with July 7, 1916, as well as the order given and accepted in June, enables us to understand the situation of the parties on and subsequent to July 7th. Vinton's fears, expressed in his letter of May 2d, proved to be well grounded, for subsequent events made it impossible for the McNicol Company promptly to manufacture and deliver wares as ordered by Vinton; and on that account a considerable number of unfilled orders that had originally been placed with the McNicol Com-

pany were returned by that company to Vinton, and he then on July 7, 1916, sent these orders to the plaintiff. Under date of July 15th the plaintiff acknowledged receipt of these orders, and stated that it had entered the orders, and that "same will have our prompt attention." Vinton's salesmen continued to solicit orders, and Vinton continued to send orders to the plaintiff, until and including September 26th.

During the period beginning with July 7th and ending with September 26th the plaintiff received and accepted a large number of orders from the defendant for the shipment of specified wares to designated retailers. Most of the orders had been filled, but a considerable number were still unfilled on September 26th. Vinton went to Huntington on September 26th and there met H. R. Wyllie, the president of the plaintiff corporation. Vinton says that the plaintiff had not been making shipments promptly. The plaintiff declares that Vinton had not been making payments promptly. Vinton asserts that deliveries had been delayed. The plaintiff avers that payments had been delayed. Vinton testified that he made the visit to "stir them on." Wyllie testified that Vinton desired to place with his company on September 26th orders amounting to $10,000, but that the company declined to accept any additional orders until the business then on hand was first cleaned up. Wyllie testified in substance that he told Vinton that the latter had not been making payments on invoices with promptness, and that no more goods would be shipped unless Vinton agreed to pay each invoice not later than fifteen days from the date of the invoice. Whenever the plaintiff filled an order by shipping it to a specified retailer, it made out and dated on the day of shipment an invoice of the wares

97 Or.—23

shipped, and immediately mailed the invoice to Vinton. As already explained, Wyllie testified that he told Vinton that the latter would be required to pay each invoice not later than fifteen days from the date of the invoice; and Wyllie stated that Vinton agreed to pay each invoice within fifteen days from its date, with the right, however, to discount the invoice one per cent. Wyllie further testified that he fixed $1,000 as the limit of Vinton's credit, and he said to Vinton:

"The way I want to do with this account, you will have to agree at any time that your account exceeds a thousand dollars, and beyond the 15-day limit, you are to be subject to draft."

Wyllie also testified that he then called in his secretary, and in the presence of Vinton explained that "this account" was limited to a thousand dollars, and directed the secretary "to hold this account within a thousand dollars." According to Wyllie's version of what occurred on September 26th, Vinton agreed to the one thousand dollar limitation. Vinton denied that he consented to pay each invoice within fifteen days, or that he agreed to honor a draft whenever the unpaid invoices exceeded $1,000. Vinton testified that from the beginning to the end of his dealings with plaintiff it was understood that they were governed by the customary terms of the trade, which were "1%, 15 days, 30 days net." Under these terms Vinton had the privilege of paying, but he was not obliged to pay, an invoice within fifteen days, and if he did he was entitled to discount the invoice one per cent. If, however, he wished, he could defer payment thirty days from the date of the invoice, but if he did so defer payment,

he was required to pay the full amount of the invoice, without any discount.

Although as previously explained, the plaintiff declined to accept the orders, aggregating about $10,000, which Vinton wished to place with the plaintiff when he was in Huntington on September 26th, yet the company did on September 26th accept one order, amounting to $62.84, which came by mail. The plaintiff never accepted any orders after September 26th, and the single order just mentioned is the only one which was accepted on that date.

On November 18th the plaintiff wired to Vinton as follows:

"We are urgently in need of funds to meet pressing obligations. Please wire us that you will accept draft of one thousand on account."

Vinton had paid for all of the invoices up to October 21st, but he had not paid for any of the invoices dated on or after October 21st. There were eighteen invoices dated on or between October 21st and October 30th; and, after adding $97.66 for freight and deducting a credit of $34.35, on November 18th the unpaid invoices amounted in the aggregate to $1,168.42. No invoice had been billed after October 30th. On November 18th the plaintiff had in its hands 110 orders still unfilled; and 45 of these unfilled orders were among those which had been placed with the plaintiff on July 7th. Upon receipt of plaintiff's wire, Vinton immediately, on November 18th, wired the plaintiff saying:

"We cannot deviate from regular terms. Will mail check ten days after date of bill of lading or will wire deposit in our bank fifteen days after date of bill of lading. As soon as we receive more shipments will pay you in full. No shipments since

October 30th. This your authority to draw for one thousand when bills of lading have been mailed for one thousand or more from this date.''

On the same date, November 18th, the plaintiff replied by wiring to Vinton:

''Bills for which we ask payment are now more than fifteen days old. You are not living up to terms as agreed. We are counting on one thousand dollars from your account Monday and will expect you to wire us that you have deposited that amount to our credit subject to draft. If you expect us to ship goods, it is up to you to live up to terms of payment.''

On November 19th, the plaintiff again wired to Vinton saying:

''If you do not pay our overdue bills as requested will not ship you another dollar's worth of goods.''

There were additional communications by letters and by telegrams, with the result that under date of December 1, 1916, the plaintiff, because of the refusal of Vinton to pay for the invoices dated on and between October 21st and October 30th, returned to Vinton the 110 unfilled orders. Upon receipt of the returned orders, Vinton placed them with the McNicol Company, and that company subsequently filled the orders, but at prices exceeding those at which the plaintiff had accepted the orders. If the plaintiff had filled the 110 orders, the cost to Vinton would have been $11,786.11. Vinton was obliged to pay the McNicol Company $14,398.09 to fill the 110 orders, and hence, the added cost to Vinton was $2,611.98. The wares specified in one of the invoices filled by the plaintiff between October 21st and October 30th was, subsequent to November 18th, seized by the plaintiff by legal process before delivery to the re-

tailer had been completed; and because of the fact
that prior to the trial this consignment of goods had
been returned to the plaintiff, the parties stipulated
that Vinton was entitled to a credit of $174.04, thus
leaving at the time of the trial a balance of $994.38
due the plaintiff for goods shipped on and between
October 21st and October 30th.

The substance of the complaint is that on and be-
tween October 21, 1916, and January 1, 1917, the
plaintiff sold and delivered to the defendant wares,
for which he agreed to pay "within a period of
fifteen days from the date of each invoice," and that
there is due and unpaid the sum of $1,168.42.

The answer admits that "upon the purchase price
and advance freights there remains unpaid" the sum
of $1,167.42. According to the printed abstract there
is a difference of one dollar between the allegations
of the complaint and the admission in the answer;
but, as we understand the evidence, the parties are
agreed upon the figures as given in the complaint.

The defendant avers in his counterclaim that dur-
ing the year 1916 the defendant purchased from the
plaintiff the wares mentioned in the complaint, and
that "as part of the same transactions * * and
agreement," the defendant placed with the plaintiff
a large number of orders, which "were duly and
legally accepted by the plaintiff." The defendant
alleges that the plaintiff knew the manner in which
he did business, and that it was aware of the fact
that the orders sent to and accepted by the plaintiff
were given for the purpose of filling like orders taken
by the defendant from retail merchants, and that
with such knowledge the plaintiff repudiated its con-
tracts with the defendant and refused to fill the then
unfilled orders, making it necessary for the defendant

to place the unfilled orders elsewhere at a cost in excess of what it would have cost the defendant if the plaintiff had filled the orders.

The reply is brief. Besides denials, the plaintiff asserts in its reply that it "accepted orders from the defendant for the manufacture and shipment of merchandise by plaintiff to defendant to various points throughout the United States, to be designated by the defendant, on the distinct understanding and agreement by and between said plaintiff and defendant that said defendant would pay to the plaintiff the amounts of each invoice of merchandise, so shipped by plaintiff on the order of the defendant, not later than fifteen days from the date of the invoice covering said shipments as made up by the plaintiff." After averring that the defendant had failed "to make the payments as agreed," and that there was due on November 18, 1916, more than $1,000, the reply states that on that date the plaintiff drew a draft on the defendant in the sum of $1,000 "to cover past due accounts owing from the defendant to plaintiff, the payment of which draft was refused by defendant," and that because of the failure "of the defendant to pay for past due shipments in accordance with the understanding and agreement between the plaintiff and defendant, and as hereinbefore set forth," the plaintiff refused to make any further shipments.

The court instructed the jury that if, on September 26th, the parties agreed that Vinton should thereafter pay for each shipment made to or for him within fifteen days from the date of the invoice, "such understanding or agreement between the parties took the place of any previous terms and conditions of shipment and payment, if there were any

previous terms or condition for orders for goods previously accepted by plaintiff from defendant, and both parties were thereafter bound by such agreement.''

After stating that ''under a contract for the continuing shipment of goods for which payments are to be made at stipulated times for previous deliveries, the seller is not bound to continue shipping unless the purchaser is ready and willing to make payments as required by the agreement,'' the court advised the jury that if Vinton agreed to pay for each shipment not later than fifteen days from the date of the invoice, and that if Vinton failed to pay for any shipment within fifteen days from the date of the invoice, the plaintiff ''had a right to refuse to make further shipments and to bring suit for the amount of the previous shipments, and defendant cannot recover damages for such refusal to make further shipments.''

The court also gave to the jury the following instruction:

''In selling or agreeing to sell goods to defendant, plaintiff had a right to limit the amount of credit it would give defendant, and when the shipments to defendant or his order, had reached in amount the limit of such credit, plaintiff was not bound to make further shipments until defendant had paid the account, or had paid an amount thereon sufficient so that the additional shipments would not increase the credit beyond the amount fixed. If, therefore, you find from the evidence that plaintiff had notified the defendant of the amount of his credit limit, I instruct you that defendant had no right to expect shipments in an amount in excess thereof; and if, at the time plaintiff failed to make additional shipments to defendant, you find that defendant was then owing to plaintiff, whether due or not due, a sum substantially

equal to the amount of such credit limit, and refused to pay until further shipments were made by plaintiff, your verdict must be for the plaintiff, and defendant is not entitled to recover any damages for plaintiff's failure to ship goods thereafter.''

REVERSED AND REMANDED.

For appellant there was a brief submitted over the names of *Mr. Walter G. Hayes* and *Messrs. Malarkey, Seabrook & Dibble.*

For respondent there was a brief prepared and submitted by *Messrs. Bauer & Greene* and *Mr. A. H. McCurtain.*

HARRIS, J.—It must be remembered that no order was accepted by the plaintiff after September 26th, and that all the orders involved in this controversy, except one, were given to and accepted by the plaintiff prior to September 26th. It must be remembered, too, that all the orders which had been filled had been paid for, except the orders filled on and between October 21st and October 30th, aggregating, with the prepaid freight charges, $1,168.42. It must also be remembered that on November 18th more than fifteen days had elapsed since October 30th, the date of the last invoice. It must likewise be remembered that on November 18th thirty days had not yet elapsed since October 21st, the date of the first invoice. The parties are agreed that the prices fixed for the invoices dated on and between October 21st and October 30th are correct, and that they have not been paid. The controversy centers around the counterclaim. The plaintiff alleges in its complaint that it accepted and filled the orders on the ''distinct understanding'' that Vinton would pay the amount of

each invoice "not later than fifteen days from the
date of the invoice," and that, since more than fifteen
days had elapsed since the date of the unpaid in-
voices, the refusal of Vinton to pay operated as a
breach and permitted the plaintiff to terminate the
contract.

The evidence given in behalf of the plaintiff and
the instructions of the court introduced into the case
an additional element, not pleaded by the plaintiff.
There was testimony to the effect that Vinton's credit
was limited to $1,000, and that Vinton agreed to
honor a draft whenever the unpaid invoices amounted
to $1,000. Vinton denied that there was at any time
an agreement limiting his credit to $1,000, or obligat-
ing him to honor a draft whenever the unpaid in-
voices aggregated $1,000, and he claimed that at all
times the agreed terms were "1%, 15 days, 30 days
net," and that, for the reason that on November 18th
thirty days had not yet elapsed since the date of
any unpaid invoice, he was not in default, and that,
therefore, the contract was breached by the plaintiff
and not by Vinton.

Since the rights and obligations of the parties are
necessarily governed by the terms of the contract or
contracts under which the orders were to be filled,
it became important at the trial to ascertain those
terms. The contention of the plaintiff as to the
terms of the contract presents itself in two phases.
On the one hand, the plaintiff says that from the be-
ginning it was understood that each invoice should
be paid within fifteen days from its date; and, on the
other hand, the plaintiff says that, even though it
be assumed that the terms were originally "1%, 15
days, 30 days net," as claimed by the defendant,
nevertheless, those terms were modified on September

26th, and from that date it was understood that each invoice should be paid for within fifteen days. The court asked the jury to ascertain the terms of the contract.

1, 2. There were no oral negotiations or oral agreements between the parties until September 26th. All the negotiations and agreements made prior to September 26th were evidenced by writings. The defendant argues that, since the contract governing the parties until at least September 26th is evidenced by writings, it was the duty of the court at all events to construe those writings, and to tell the jury what the terms of the contract were. In other words, the defendant argues that the most that could have been submitted to the jury was whether or not the contract which existed to and until September 26th was on that date modified by an oral agreement, and, if modified, whether the terms were as claimed by the plaintiff. Of course, the legal effect of a writing is ordinarily to be determined by the court, and not by the jury: *Henry* v. *Harker,* 61 Or. 276 (118 Pac. 205, 122 Pac. 298). In the instant case, however, some of the writings contain statements which afford support for the contention of the plaintiff that from the beginning Vinton agreed to pay on each invoice within fifteen days, as, for example, the letter of July 7th, in which Vinton says:

"For your information might state that it is our intention to discount your bills";

and the letter of August 31st, in which Vinton declares:

"As stated to you when we first began sending you orders, we fully expect to discount all of our bills with you."

On the other hand, some of the writings contain statements supporting the position taken by the defendant, for upon every invoice sent to Vinton there was typewritten the following: "1%, 15 days, 30 days net." The plaintiff offered evidence which it says explains these typewritten words and figures and harmonizes them with its contention that each invoice was due within fifteen days. We do not think that the court can say as a matter of law, after an inspection of the writings, that the agreement was as claimed by the plaintiff or as contended for by the defendant; but it was appropriately a question for the jury to decide what the parties intended, after viewing the writings in the light of the course of dealing followed by the parties, and in the light of the accompanying circumstances.

3. If the terms fixing the time of payment were changed at all, the change was made orally on September 26th; and the modification, if any there was, was understood to apply, not only to any future orders that might be given and accepted, but also to the then accepted, but unfilled, orders. All of the unfilled orders in the hands of the plaintiff on September 26th constituted, the defendant contends, contracts. If these unfilled orders were contracts, they were bilateral executory contracts; and the parties could therefore modify them by fixing a different time for payment. There is much contrariety of judicial opinion concerning the question of the necessity of a consideration, and concerning what constitutes a sufficient consideration for the modification of an existing executory contract; and, although the defendant apparently concedes that, if there was a modification agreed upon by the parties on September 26th, the modification became legally effective, still we

deem it appropriate to say that in our view, if there was a modification on September 26th, the modification became effective and was binding on both parties, especially since the plaintiff was contending that the defendant had defaulted in his previous payments, and the defendant was insisting that the plaintiff had been unreasonably slow in making shipments: *Capital Food Co.* v. *Mode & Clayton,* 112 Ark. 165 (165 S. W. 637); 35 Cyc. 124; note in L. R. A. 1915B, 17; 3 Elliott on Contracts, § 1989; *Scott* v. *Hubbard,* 67 Or. 498, 506 (136 Pac. 653); *Feldman* v. *Fox,* 112 Ark. 223 (164 S. W. 766); 1 Elliott on Contracts, § 243.

The American authorities are in irreconcilable conflict upon the question as to whether or not the seller may terminate the contract on account of a default in the payment of an installment, when the contract provides for the sale and delivery of a given commodity in stated installments which are to be separately paid for. In this country it is probably accurate to say that the weight of judicial opinion is now to the effect that, if the buyer defaults in the payment of a given installment, the seller may treat the default as a breach and terminate the contract, without incurring any liability for damages for the failure to make delivery of subsequent installments: *Ross-Meehan Foundry Co.* v. *Royer Wheel Co.,* 113 Tenn. 370 (83 S. W. 167, 3 Ann. Cas. 898, 68 L. R. A. 829); *Ohio Valley Buggy Co.* v. *Anderson Forging Co.,* 168 Ind. 593 (81 N. E. 574, 11 Ann. Cas. 1045); *Alpha Portland Cement Co.* v. *Oliver,* 125 Tenn. 135 (140 S. W. 595, Ann. Cas. 1913C, 120, 38 L. R. A. (N. S.) 416); 24 R. C. L. 280.

According to what is probably the minority view, the failure of the buyer to pay an installment does not give the seller an absolute right to terminate the

contract, unless, in addition to the naked act of failure or refusal to pay, the conduct of the buyer shows an intention on his part to abandon or no longer be bound by the terms of the contract, as, for example, where the default is accompanied with a deliberate demand insisting upon new terms different from the original agreement: *Johnson Forge Co.* v. *Leonard,* 3 Penne. (Del.) 342 (51 Atl. 305, 94 Am. St. Rep. 86, 57 L. R. A. 225). Prior adjudications are our warrant for declaring that Oregon may be included among the jurisdictions where the minority view prevails: *Barnes* v. *Leidigh,* 46 Or. 43, 45 (79 Pac. 51); *Longfellow* v. *Huffman,* 55 Or. 481, 486 (104 Pac. 961); *Krebs Hop Co.* v. *Livesley,* 59 Or. 574 (114 Pac. 944, 118 Pac. 165, Ann. Cas. 1913C, 758); *Armsby* v. *Grays Harbor Commercial Co.,* 62 Or. 173, 183 (123 Pac. 32); *Walker* v. *Warring,* 65 Or. 149, 156 (130 Pac. 629).

4. According to the rule which governs in this jurisdiction, the failure of the buyer to pay an installment does not alone and of itself enable the seller to terminate the contract, so as to avoid liability for failure to make subsequent deliveries called for by the contract; but, in addition to the bare fact of failure to pay, the conduct of the buyer must indicate an intention on his part to abandon the contract, or a design no longer to be bound by the terms agreed upon. In some of the states, including Oregon, legislation has been enacted governing the subject. However, the instant case is not controlled by Chapter 91, Laws of 1919, for the reason that it is expressly provided in Section 76a of the statute that the act shall not apply to any sale or contract to sell "made prior to the taking effect of this act."

5. Of course, the parties may expressly stipulate that payment for one delivery shall be a condition precedent; and, consequently, if a contract for the continuing delivery of wares contains such a stipulation, the failure of the buyer to pay a given installment enables the seller to rescind, regardless of what the rule might be in the absence of such a stipulation: *West* v. *Bechtel,* 125 Mich. 144, 163 (84 N. W. 69, 51 L. R. A. 791); *Johnson Forge Co.* v. *Leonard,* 3 Penne. (Del.) 342 (51 Atl. 305, 94 Am. St. Rep. 86, 91, 57 L. R. A. 225). If, therefore, the payment of each invoice was by agreement made a condition precedent as to subsequent orders, then the plaintiff had the absolute right to terminate the contract if the defendant refused to pay any installment within the time fixed for payment.

If from the beginning the payment of each invoice was made a condition precedent as to subsequent orders, then there was no modification of the contract on September 26th, unless it can be said that the parties agreed to limit the defendant's credit to $1,000, with the right on the part of the plaintiff to draw on the defendant whenever the unpaid invoices aggregated $1,000, regardless of whether or not fifteen days had elapsed since the dates of the invoices. If in the beginning the contract allowed Vinton a discount of 1 per cent if he chose to pay within fifteen days, and also allowed him the privilege of taking thirty days without a discount, then, if there was a modification on September 26th, the change included either one or two particulars. If there was only one change, it may have related to the limitation of fifteen days claimed to have been fixed for the payment of each invoice, or it may have related to the limitation of $1,000 said to have been placed upon Vinton's credit.

All of the invoices dated on or between October 21st and October 30th were more than fifteen days old; but they aggregated more than $1,000. It may have been that the jury found that the defendant's credit was limited to $1,000, but that the defendant was, under the contract, entitled to take thirty days for the payment of each invoice, unless the aggregate of the invoices amounted to $1,000. The court submitted to the jury the question of the limitation upon defendant's credit, notwithstanding the fact that the pleadings were silent upon that subject. We do not attempt to determine whether the plaintiff's pleadings permit the introduction of evidence showing a modification of a prior contract, for the reason that this question is not argued in the briefs. However, it is manifest that, in view of the issues made by the pleadings, the instructions given by the court concerning the subject of the limitations upon Vinton's credit were prejudicially erroneous; and the judgment must therefore be reversed and the cause remanded for a new trial.                    REVERSED AND REMANDED.

McBRIDE, C. J., and BENSON and BURNETT, JJ., concur.